UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| Barry Robinson, | ) | C/A No. 4:11-3459-MGL-KDW |
| | ) | |
| Plaintiff, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| vs. | ) | |
| | ) | |
| BGM America, Inc., d/b/a | ) | |
| Beneteau USA, Inc., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Plaintiff Barry Robinson ("Plaintiff" or "Robinson") filed this action in the United States

District Court, Florence Division, on December 20, 2011, based on the court's federal question

jurisdiction. Plaintiff seeks recovery against Defendant BGM America Inc., d/b/a Beneteau USA,

Inc. ("Defendant" or "Beneteau"). He alleges causes of action for race discrimination and

retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.

§§2000e *et seq.* ("Title VII") and S.C. Human Affairs Law, S.C. Code Ann. §§ 1-13-20 and 1-

13-80(a)(1), and discrimination in violation of the Americans with Disabilities Act of 1990

("ADA"), 42 U.S.C. §§ 12101, 12112(b).[1] This matter comes before the court on Defendant's

Motion for Summary Judgment. ECF No. 30. The undersigned conducted a hearing on

Defendant's motion on June 20, 2013, at which Plaintiff and Defendant appeared through

---

[1] Although not specifically cited by Plaintiff, the ADA was amended, effective January 1, 2009, by the Americans with Disabilities Act Amendments Act ("ADAAA"), Pub. L. No. 110-325, § 8; 122 Stat. 3553 (Sept. 25, 2008).

counsel. Having considered the parties' briefs and argument, the undersigned submits this Report[2] recommending Defendant's Motion be granted.

I.     Factual Background

Defendant Beneteau, a yacht manufacturer, opened its manufacturing facility in Marion, South Carolina in 1986. Def.'s Mem. 2, ECF No. 30-1.  Plaintiff, a Black male, was hired by Beneteau in 1986. Pl.'s Resp. to Mot. for Summ. J. 2, ECF No. 32. Prior to 1996, Plaintiff was promoted to a first-line supervisor on one of Defendant's manufacturing lines. ECF No. 30-1. On July 3, 1996 Plaintiff filed a Charge of Discrimination with the South Carolina Human Affairs Commission in which he alleged that he had been subjected to discriminatory terms and conditions of employment by a Beneteau production manager on the basis of race. ECF No. 33-14. Plaintiff later withdrew that complaint, and in a note dated July 30, 1996, wrote that he did not believe he was discriminated against on the basis of race. ECF No. 30-4 at 38.[3]  Plaintiff remained employed with Beneteau continuously until the time of his resignation from the company. Pl.'s Dep. 117:5-10, ECF No. 30-3 at 50. During his employment Plaintiff received regular pay raises, bonuses, performance evaluations, and satisfactory or close-to-satisfactory performance reviews. *Id.* at 117:11-25.

Faced with difficult economic times in the late 2007/early 2008 time-frame, Defendant took measures including reductions-in-force ("RIFs"), furloughs, and job reassignments to match the work force with business demands. *See* Human Resources ("HR") Director Jennifer Reinman ("Reinman") Dep. 27:2-28:17, 30:8-31:4, 31:23-33:13; ECF No. 33-1. Reinman testified that

---

[2] All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Local Civil Rule 73.02(B)(2)(g), D.S.C.  Because the Motion for Summary Judgment is dispositive, this Report and Recommendation is entered for the district judge's consideration.

[3] Plaintiff submits he withdrew that complaint "only because he believed there would be a change in communication between management." Pl.'s Mem. 10, ECF No. 32.

employees were selected for layoff or reassignment based on their present skills, transferable skills, training, accident and attendance records, and performance reviews. *Id.* at 30:4-22, 31:1-4. Defendant experienced a second RIF in late 2008 and the same criteria were used for determining which employees would be laid off. *Id.* at 32:1-5.

After the first RIF in 2008 but before the second 2008 RIF, Defendant reconfigured its manufacturing process from one with multiple production lines to one with a single, continuous production line. This more streamlined "lean manufacturing" configuration was thought to be more efficient. At the end of the continuous line was the Deck Hardware area, where hardware such as rails, windows, and hinges would be put on the yachts. *See id.* at 27:2-28:17, 29:15-21.

In early-to-mid 2008,[4] Plaintiff was moved from the position of being a line supervisor to being a crew leader of Deck Hardware. *Id.* at 32:25-33:10. It is Plaintiff's understanding that his prior position as a line supervisor then was eliminated, so it was not filled by another.

On September 23, 2008, while a crew leader in the Deck Hardware Department, Plaintiff received a Written Employee Reprimand and three-day unpaid suspension for failure to "consistently follow SOP procedures for work in process in his department" and for failure to "accept responsibility for the results of work performed by his employees." ECF No. 33-3 at 1-2. As set out in a November 14, 2008 note by HR Director Reinman, Plaintiff and his then-supervisor, Andy Thatcher, met with Reinman and Defendant's President, Wayne Burdick, on September 23, 2008 regarding that reprimand and suspension. Internal Mem. 3-4, ECF No. 33-3 (internal memo from Reinman recounting meeting). According to Reinman's notes, Plaintiff recounted that, on or around September 17, 2008, Thatcher and Plaintiff met in Thatcher's office, and Thatcher told Plaintiff he would "get him." *Id.* at 3 (noting Plaintiff's words in quotation

---

[4] Neither party provided a specific date on which this transition took place.

marks). In the September 23, 2008 meeting with Plaintiff, Reinman, and Burdick, Thatcher denied making such a comment and said Plaintiff was lying. *Id.* As set out by Reinman in her internal memorandum, Plaintiff explained:  "Yes, you did [say that] when I asked you to have a meeting you said 'don't worry about it cause I will get you in due time.'" *Id.* (noting Plaintiff's words regarding Thatcher's statement in quotation marks). Reinman's notes also recount an October 14, 2008 meeting between Plaintiff, Burdick, and Reinman, at which Plaintiff further explained his September 17, 2008 encounter with Thatcher. Plaintiff explained that Thatcher told him there had been complaints that he [Plaintiff] had not responded to quality-control issues regarding windows. *Id.* In response, Plaintiff asked that Thatcher call a meeting with those involved. At that time, Thatcher told Plaintiff a meeting would be unnecessary "at that time[,] and he would get to it." *Id.* (Reinman's phrasing in her internal memorandum, not quoting Plaintiff). Reinman's internal memorandum further indicates a meeting later that same week among Thatcher, and Burdick, and herself. *Id.* Thatcher recalled having told Plaintiff he held Plaintiff "totally accountable" for the leaking windows and would discuss it further with him at a later date. *Id.* (Reinman quoting Thatcher). Thatcher explained his comment to Plaintiff meant that he planned to wait until further testing had been performed concerning the quality-control issue. *Id.* Reinman's notes also indicate she questioned the supervisor Plaintiff "allegedly confided in after the discussion with [Thatcher, and] that supervisor did not recall [Plaintiff] giving him any specifics[.]" *Id.* (Reinman's phrasing in internal memorandum).

As part of the lead-up to the November 2008 RIF and reassignments, Defendant eliminated a number of salaried positions through attrition or resignation. Among those were the following: Mold Room Manager (White male); Marketing Communications (White male); Hiring Coordinator (White male); MIS Programmer (White male), and an Assembly Line

Supervisor (White male). Reinman Dep. 83:4-85:9, ECF No. 33-1; Def.'s ex. 2 to Reinman Dep., ECF No. 30-5 at 45-50.  In November 2008, Defendant terminated 44 team members who were paid an hourly wage. Ex. 9 to Pl.'s Dep., ECF No. 30-4 at 3. In addition, Defendant eliminated the following four salaried positions at that time: Deck Hardware Supervisor (Plaintiff's position); Grinding Supervisor (Black male); Stockroom Supervisor (White female); and Customer Service Receptionist (White female). Three of these four held supervisor positions; only the White female supervisor was terminated. The supervisory reductions continued several months later when three more White male supervisors were moved to hourly positions when business did not improve. *See* Def.'s ex. 2 to Reinman Dep., ECF No. 30-5 at 45-50.

In early November 2008, Defendant gave Plaintiff the option of being demoted or laid off. *See* Pl.'s Dep. 41:15-42:25, ECF No. 30-3. Plaintiff chose to remain in Defendant's employ. *Id.* at 43:1-3. A November 7, 2008 letter from Defendant's President to Plaintiff indicates that, effective November 10, 2008, Plaintiff would begin work as a Component Installer Crew Leader which was an hourly, rather than salaried, position. Nov. 7, 2008 Ltr. to Pl., ECF No. 33-2.  As Component Installer crew leader, Plaintiff's job duties were a combination of line supervisor and component installer. Reinman Dep. 21:16-25; 22:6. A crew leader would perform the duties of an installer and also make sure the work was done properly. *Id.* at 22:7-9. Because of its economic situation, Beneteau did not view the change from supervisory to hourly positions as demotions; however, Plaintiff considered his change to an hourly employee as a demotion. *See id.* at 37:16-25. Plaintiff's pay was reduced. *See* Nov. 7, 2008 Ltr. to Pl., ECF No. 33-2 (referencing a reduction in pay).

In late summer or early fall of 2009, Plaintiff mentioned to a supervisor and/or another employee of Defendant that he planned to leave the company at the end of the year to start his

own business. Pl.'s Dep. 75:8-25; 76:1-3, ECF No. 30-3. Although Plaintiff had not provided any written communication to the company about resigning, on September 9, 2009, Reinman sent an email to Defendant's president, Burdick, noting that Plaintiff would "be giving his final notice next month for Dec. 31st as he is starting his own business." Def.'s ex. 1 to Reinman Dep., ECF No. 30-5 at 44.

On October 29, 2009, Plaintiff called in to the employee reporting phone line and left a message stating that his right calf was hurting and he was going to the doctor. Pl.'s Dep. 108:12-16, ECF No. 30-3. On October 30, 2009, Plaintiff again called in and left a message that he was under a doctor's attention, and had his son drop off a doctor's excuse. *Id.* at 108:17-24. The excuse from Dr. Gerard Jebaily was dated October 29, 2009, and read: "Low back pain, Light duty off 10/29, 10/30." ECF No. 33-5. Plaintiff did not return to work during the month of November because he was scheduled to be off on voluntary furlough. Pl.'s Dep. 82:10-22, ECF No. 30-3.

Defendant's attendance policy operates on a point system.  If an employee accrues five points then the employee receives a verbal warning. Reinman Dep. 46:4-6, ECF No. 30-5. After seven points, the employee receives a first notice, after nine points the employee receives a second notice, after 11 points the employee receives a third notice, and after 12 points the employee is terminated. *Id.* at 46:8-10.  As of October 23, 2009, Plaintiff was aware that, through September 17, 2009, he had accumulated eight-and-one-half points. Pl.'s Dep. 80:8-12, ECF No. 30-3; Employee Warning Notice, ECF No. 30-4 at 1-2 (signed by Plaintiff and indicating "8 ½ pts. as of 9/17/09").[5]  In late October 2009, after running attendance reports, Reinman issued

---

[5] In responding to Defendant's Motion, Plaintiff takes issue with several of these records. *See* Pl.'s Mem. 4-5, ECF No. 32. To the extent they are relevant to the analysis, points Plaintiff raises about his absences are discussed within.

attendance notices. *Id.* at 47:12-13. Because Plaintiff had not returned to work, Reinman sent a letter to Plaintiff dated December 11, 2009, attaching his second and third written notices for absences through October 16, 2009, and October 31, 2009, respectively. ECF No. 33-11.  As of October 16, 2009, Plaintiff had accumulated nine-and-one-half points, and as of October 31, 2009, Plaintiff had accumulated 12 points. *Id.*

Plaintiff replied to Reinman in a letter dated December 14, 2009, and stated that the "accumulated attendance points against me is (sic) not accurate, and needs to be corrected." ECF No. 33-13 at 1. Plaintiff stated in the letter that he was "still under [his] doctor" and that the MRI from his "reinjury" had not yet been read. *Id.* Plaintiff also set out his concerns regarding his alleged demotion, harassment, and unfair treatment and intent to resign, stating the following:

> Here are some concerns I want you to be aware of
> After being in Management for 22 years[,] I was informed on November 5, 2008 that I would be demoted [sic] or layed [sic] off. While it was my intent to retire from Beneteau, I had to make a decision to provide a detailed letter of resignation. I have been harassed and not treated fairley [sic] through October 28, 2009 and continuing. My work has been criti[ci]zed more than the performance of similarly situated employees. I performed as well as and even better than they did. I continued to have problems no matter what I did. The Agreement in my new position as a new component installer crew leader was not followed as agreed. Because of these conditions I could not perform my job more effectively and correctly. I am known to be a true Beneteau employee.

*Id.*  Reinman testified that she contacted Plaintiff to follow-up on the attendance issues, and consulted with the appropriate Beneteau personnel regarding Plaintiff's claims of harassment and unfair treatment. Reinman Dep. 50:12-25, 52:1-22, 69:5-70:2, ECF No. 33.

In a four-page typewritten letter dated December 15, 2009, Plaintiff provided Beneteau with written notice of his formal resignation.  ECF No. 33-13 at 2-5.  Referring to his November 2008 new position as a demotion, Plaintiff alleged that "while performing physical labor in this

position, [he] suffered an on the job injury and reinjured [his] back." *Id.* at 3. Plaintiff also alleged harassment, unfair treatment, and racial discrimination. *Id.* at 3-4.

After filing a complaint with the U.S. Equal Employment Opportunity Commission ("EEOC"), Plaintiff received a Notice of Suit Rights dated September 22, 2011. Compl. ¶ 11, ECF No. 1. On November 27, 2011, Plaintiff was awarded disability benefits through the Social Security Administration with a disability onset date of October 28, 2009. ECF No. 33-9. Plaintiff filed the instant suit on December 20, 2011, alleging discrimination on the basis of race, retaliation, and failure to accommodate his disability.

II.    Discussion

A.  Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See*

*Anderson*, 477 U.S. at 255. However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248; *see also Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990) (noting court could not assume the existence of a genuine issue of material fact when none exists).

All that is required is that "sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 249. "Mere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). A party cannot create a genuine issue of material fact solely with conclusions in his or her own affidavit or deposition that are not based on personal knowledge. *See Latif v. The Cmty. Coll. of Baltimore*, 354 F. App'x 828, 830 (4th Cir. 2009) (affirming district court's grant of summary judgment, noting plaintiff's affidavit, which offered conclusions not based on his own knowledge, did not create genuine issues of material fact).  In discrimination cases, a party is entitled to summary judgment if no reasonable jury could rule in the non-moving party's favor. *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002) (Title VII). The court cannot make credibility determinations or weigh the evidence, but the court should examine uncontradicted and unimpeached evidence offered by the moving party. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court must determine whether a party's offered evidence is legally sufficient to support a finding of discrimination and look at the strength of a party's case on its own terms. *See id.* at 148 (stating that "[c]ertainly there will be instances where, although the plaintiff has established a prima facie case and set forth

sufficient evidence to reject the defendant's explanation, no rational fact-finder could conclude that the action was discriminatory").

B.     Analysis

Plaintiff raises claims of retaliation and race discrimination pursuant to Title VII. He also alleges violation of the ADA. A plaintiff may demonstrate a violation of Title VII through direct or circumstantial evidence. When direct evidence is lacking, a plaintiff may produce circumstantial evidence and proceed under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Pursuant to this framework, once the plaintiff establishes a prima facie case of a violation of Title VII, the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for its employment action. *Merritt v. Old Dominion Freight*, 601 F.3d 289, 294 (4th Cir. 2010). If the defendant meets the burden to demonstrate a legitimate, nondiscriminatory reason for its employment action, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the proffered reason was "not its true reason[ ], but [was] a pretext." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

1.   Title VII Retaliation Claim

Title VII makes it an "unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).  Absent direct evidence proof of retaliation, in order to establish a prima facie case for retaliation under Title VII, a plaintiff must show the following: "(1) []he engaged in a protected activity; (2) the employer took an adverse employment action against [him]; and

(3) a causal connection existed between the protected activity and the asserted adverse action." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 271 (4th Cir. 2011) (internal quotation omitted). If Plaintiff is able to establish a prima facie case for retaliation, Defendant can rebut the presumption by articulating a legitimate non-retaliatory reason for its action. Discussing a defendant's burden, the court has explained: "What shifts is merely a burden of producing admissible evidence (something more than a pleading) that would, if believed, be legally sufficient to justify a judgment for the defendant." *Taylor v. Ingles Markets*, C.A. No. 802407227, 2004 WL 3591133, *5 (D.S.C. Dec. 13, 2004) (citing *Burdine*, 450 U.S. at 255). The employer, however, does not have the burden of persuading the court that it was actually motivated by the proffered reason. *Id.* "The employer's burden is satisfied if he simply 'explains what he had done' or 'produce[es] evidence of legitimate, nondiscriminatory reasons.'" *Williams v. Sonoco Prods. Co.*, C.A. No. 81-1469-0, 1982 WL 423, at *3 (D.S.C. Nov. 8, 1982) (citing *Bd. of Trustees of Keene State Coll. v. Sweeney*, 439 U.S. 25 (1978)). A plaintiff bears the final burden of proving that the reason given by a defendant is a pretext for unlawful retaliation. *Reeves*, 530 U.S. 133. In *Reeves*, the Supreme Court clarified a plaintiff's burden to show pretext once the employer articulates a legitimate reason for its adverse action. The Court held that a plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence. *Reeves*, 530 U.S. at 143. "The ultimate question is whether the employer intentionally discriminated, and proof that the employer's proffered reason is unpersuasive, or even obviously contrived, does not necessarily establish that the plaintiff's proffered reason . . . is correct." *Reeves*, 50 U.S. at 146 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 524 (1993)). "Certainly there will be instances where, although the plaintiff has established a prima facie case and set forth sufficient

evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory." *Reeves*, 530 U.S. at 148.

Plaintiff has not offered any direct evidence of retaliation. Plaintiff focuses on two events as "protected activity" for purposes of satisfying the first element of his prima facie retaliation case. First, Plaintiff claims he was retaliated against "as a result of his prior filing of discrimination in 1996 (EEOC #14C-1996-0957)." Compl. ¶ 9(f), ECF No. 1. Then, Plaintiff points to discussions after his reprimand for quality-control issues in 2008. Plaintiff characterizes his meetings with Defendant's president and HR director about what his direct supervisor said to him in connection with the reprimand as having made Defendant aware that Plaintiff "believed his supervisor was treating him unfairly." Pl.'s Mem. 3, ECF No. 32; *see* ECF No. 33-3 at 2-3.

Plaintiff characterizes the "adverse action taken against him"—the second prong of his prima facie case—as when he was "demoted to an hourly employee, then forced to do physical labor that he had not done for 22 years, then reprimanded with up to a final warning for attendance violations while he suffered from [a] disabling condition[.]" Pl.'s Resp. 11, ECF No. 32.  For purposes of its Motion, Defendant does not question that Plaintiff has satisfied the second prong. *See*  Def.'s Mem. 9, ECF No. 30-1. The court now considers the first and third prongs.

a.    Retaliation Claim Based on the 1996 EEOC Charge

Regarding the 1996 EEOC Complaint, there is no question that such a complaint is a "protected activity," thereby satisfying the first prong. *See Laughlin v. Metro. Washington Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998). The third element Plaintiff must establish to prove a prima facie retaliation case is that a causal connection exists between the protected activity and the employment action.  To establish this connection, Plaintiff must show Defendant

was aware of the protected activity and "[t]here must be some degree of temporal proximity to suggest a causal connection." *Constantine v. Rectors and Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005). Courts have found a causal connection exists when an employer takes adverse employment action against an employee "shortly after learning of the protected activity." *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). However, "[a] lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action . . . negates any inference that a causal connection exists between the two." *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998).

Defendant argues the 1996 EEOC Complaint is so far removed from the 2008-09 claimed adverse activities that the court should find Plaintiff has not established the requisite causation as a matter of law. The court agrees. Both the Supreme Court and the Fourth Circuit have held as a matter of law that such a lapse of time between protected activity and adverse employment action is insufficient to establish causation. *See, e.g., Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding a 20-month delay too long to establish a causal connection and noting cases that found three-to-four-month delays too remote to establish causation based on temporal proximity); *cf. King v. Rumsfeld*, 328 F.3d 145, 151 n.5 (4th Cir. 2003) (noting a delay of two months and two weeks long can be enough to weaken significantly the inference of causation between the two events).

Here, Plaintiff filed an EEOC Complaint in 1996. Plaintiff dismissed the EEOC Complaint that same year, noting he did not believe Defendant had discriminated against him. *See* Pl.'s Dep. 93:13-94:5, ECF No. 30-3; ex. 16 to Pl.'s Dep., ECF No. 30-4 at 37-38.[6]  The

---

[6] Plaintiff argues he withdrew the 1996 EEOC Complaint "only because he believed there would be a change in communication between management." Pl.'s Mem. 10, ECF No. 32. Why that EEOC Complaint was withdrawn is of no moment here. *See Anderson,* 477 U.S. at 248 (noting

complained-of allegedly adverse employment actions took place, at the earliest, in 2008, when Plaintiff was moved from his line position—some 12 years after Defendant had knowledge of Plaintiff's 1996 EEOC filing. These events are too far removed from each other to provide the requisite causal connection. *See Breeden*, 532 U.S. at 273. Because Plaintiff cannot establish a causal connection based on the 1996 EEOC Complaint, the undersigned finds as a matter of law that Plaintiff has not set forth a prima facie case of retaliation in relation to that EEOC Complaint. This portion of Plaintiff's Title VII retaliation claim need not be analyzed further.

   b.   The 2008 "Complaint"

   Plaintiff also characterizes as a "protected act" for purposes of his Title VII retaliation claim his October 14, 2008 meeting with his supervisor, Thatcher; Defendant's president; and Defendant's HR Director at which time Plaintiff relayed that Thatcher told him in September 2008 that he was "out to get" him. This discussion took place in connection with Plaintiff's having been disciplined regarding quality-control issues. In his brief, Plaintiff characterizes this meeting as having made Defendant "aware that he believed his supervisor was treating him unfairly." Pl.'s Resp. 3, ECF No. 32; Employee Reprimand (Sept. 23, 2008) 2, ECF No. 33-3.

   Defendant argues that this 2008 complaint was never related to racial issues or to the 1996 EEOC Complaint. Accordingly, Defendant submits, this could not be a "protected activity" for purposes of proving a prima facie retaliation claim. In response, Plaintiff's counsel argued at the hearing that Plaintiff should not be punished for not filing an EEOC Complaint in 2008. Plaintiff characterizes his "complaint of unfair treatment in 2008" as concerning "the same issues in his 1996 complaint." Pl.'s Mem. 11, ECF No. 32.

---

only disputes that impact outcome of suit may "properly preclude summary judgment"). Undisputedly, The EEOC Complaint was filed and withdrawn in 1996.

A protected activity does not have to be the filing of an EEOC Complaint.  An employee engages in protected activity when he opposes discriminatory practices in the workplace or participates in an investigation, proceeding, or hearing under Title VII. *See Laughlin*, 149 F.3d at 259. "Opposition activity encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities."  *Id.*  Title VII's anti-retaliation provision not only protects activity in opposition to employment actions actually unlawful under Title VII, but also employment actions an employee reasonably believes to be unlawful. *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 406-07 (4th Cir. 2005).

Here, however, Plaintiff has not set forth any evidence that any of his 2008 complaints about his supervisor or complaints about the 2008 discipline were in any measure related to racial discrimination. *See Baqir v. Principi*, 434 F.3d 733, 748 (4th Cir. 2006) (holding plaintiff had not established a prima facie retaliation case because he had not shown that relevant officials of his employer were aware of his participation in protected activity at the time the claimed retaliation took place). Further, as a former supervisor, Plaintiff was familiar with policies in place regarding the reporting of complaints of discrimination. *See* Def.'s Mem. 9, ECF No. 30-1. However, Plaintiff did not report any such complaints in 2008.

Accordingly, the undersigned is of the opinion that Plaintiff's 2008 "complaint" is insufficient to establish participation in a protected activity for purposes of his retaliation claim. Further, to the extent Plaintiff is arguing the 2008 events in some manner "relate" to the 1996 EEOC Complaint to somehow "revive" it for purposes of his retaliation claim, such a claim must fail. Nothing in Plaintiff's 2008 "complaint" about his supervisor indicated alleged racial discrimination or harassment, nor has Plaintiff cited any case law to support an argument that the

2008 events nonetheless relate to the 1996 EEOC Complaint and "revive" the 1996 Complaint for purposes of establishing the requisite causal connection between "protected activity" and any adverse action. Accordingly, Plaintiff cannot establish a prima facie case of retaliation and that cause of action should be dismissed.[7]

    2.  Title VII Race Discrimination Claims

Under the *McDonnell Douglas* framework, a plaintiff is first required to establish a prima facie case of discrimination, showing the following: (1) he belongs to a protected class; (2) he suffered an adverse employment action; (3) at the time of the adverse action, he was performing his job at a level that met his employer's legitimate expectations; and (4) the circumstances gave rise to an inference of unlawful discrimination. *Howard v. Lakeshore Equip. Co.*, 482 F. App'x 809, 810 (4th Cir. 2012); *see also Adams v. Trustees of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011) (in failure-to-promote context). Supreme Court and Fourth Circuit cases analyzing Title VII show that an inference of unlawful discrimination may be demonstrated in a variety of ways. For example, in a Title VII case, the plaintiff may establish an inference of discrimination by showing that the position remained open or was filled with someone similarly qualified from outside the protected class. *Hill v. Lockheed Martin Logistics Mgmt*., 354 F.3d 277, 285 (4th Cir. 2004) (en banc); *see also Miles v. Dell, Inc*., 429 F.3d 480, 485 (4th Cir. 2005) (same). If the plaintiff shows the prima facie case, "the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for the adverse employment action." *Hill*, 354 F.3d at 285. If the employer does so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated reasons are a pretext for unlawful discrimination. *Id.*

---

[7] In Plaintiff's two letters of resignation, he indicated he wished to make Defendant aware of some concerns. *See* Pl.'s Dec. 4 and Dec. 15, 2009 Ltrs., ECF No. 33-13. These "complaints" were made when Plaintiff resigned, so cannot be causally related to any alleged retaliatory actions by Defendant.

In seeking summary judgment, Defendant does not focus on Plaintiff's prima facie case, nor does it concede Plaintiff has established elements necessary to establish a prima facie case. Rather, in briefing and at the hearing, Defendant focuses its argument on showing its actions of transferring Plaintiff were not pretextual—arguing actions that impacted him were taken in light of a difficult economy and were done without regard to race. *See* Def.'s Mem. 11-13, ECF No. 30-1; Def.'s Reply 2-5. Defendant also argues Plaintiff's discrimination claim is too vague to survive summary judgment. Def.'s Mem. 17.

As an initial matter, the undersigned is of the opinion that Plaintiff has not set forth a prima facie case of Title VII discrimination. Specifically, Plaintiff has not provided evidence sufficient to establish the fourth prong—an "inference of discrimination" from employment actions taken against Plaintiff. A plaintiff who has been the subject of an adverse employment action (and meets other criteria of proving a prima facie case) may establish an inference of discrimination by showing that his position remained open or was filled with someone similarly qualified from outside the protected class. *Hill*, 354 F.3d at 285. In this case, the two positions on which Plaintiff focuses were not filled by anyone from outside Plaintiff's protected class. In fact, both of the positions at issue—that of Line Supervisor and of Deck Hardware Supervisor—were not filled at all because both of those positions were eliminated as part of Defendant's downsizing/restructuring. Plaintiff was moved to the Deck Hardware Supervisor position as the result of a restructuring decision to streamline the production process. Reinman Dep. 27:7-28:25, 32:25-33:3, ECF No. 33-1. His Line Supervisor position ceased to exist. Similarly, the position of Deck Hardware Supervisor was eliminated as part of a further restructuring. *See* Pl.'s Dep. 41:23-25, ECF No. 30-3.

In discussing his November 2008 transfer from the Deck Hardware position to the position of Component Installer Crew Leader, Plaintiff indicates that he "recalls that he was the only line supervisor to be demoted while other line supervisors were not demoted or eliminated until at least 6 months later." Pl.'s Br. 10, ECF No. 32. He cites no record evidence to support that claim.

On the other hand, Defendant cites to specific evidence regarding those similarly situated. From early 2008 through mid-year 2010, Defendant laid off approximately 134 employees. Def. ex. 2 to Reinman Dep., ECF No. 30-5. Prior to the November 2008 RIF, Defendant had eliminated several salaried positions that had been held by White males, including the Mold Room Manager; Marketing Communications; Hiring Coordinator; MIS Programmer, and an Assembly Line Supervisor (eliminated by termination). *Id.*; Reinman Dep. 83:4-85:9, ECF No. 33-1. In November 2008, Defendant eliminated four more salaried positions, and terminated 44 hourly-paid team members. Exs. 7, 9 to Pl.'s Dep., ECF Nos. 30-4. One of those four positions was that of Deck Hardware Supervisor, which had been held by Plaintiff. The other salaried positions eliminated at that time were these: Grinding Supervisor (held by a Black male); Stockroom Supervisor (held by a White female); and Customer Service Receptionist (held by a White female). Three of the four salaried positions eliminated in November 2008, including Plaintiff's, had been supervisory positions. At that time, only the White female Stockroom Supervisor was terminated. The Black male Grinding Supervisor was also "demoted" to an hourly-paid position at the time as Plaintiff. In addition, other White male supervisors were moved to hourly-paid positions several months later because business had not improved. *See* Def.'s ex. 2 to Reinman Dep., ECF No. 30-5 at 49.

Compiling the information provided by Defendant, during the time-frame at issue, Defendant eliminated 11 management positions, nine of which (or 82%) had been held with White associates and two of which (or 18%) had been held by Black associates. Five of these 11, including Plaintiff, were moved to hourly positions. Among those five who remained employed, two were Black and two were White. No Black member of the management team was terminated, although similarly situated Whites were terminated. Reinman Dep. 83:4-85:9.

Plaintiff's general argument that he had been the "only line supervisor to be demoted" in November 2008, is not supported by evidence. Instead, Defendant has provided clear evidence to the contrary. Plaintiff has not established an "inference of discrimination" sufficient to establish his prima facie case for his Title VII discrimination claim.

Assuming, *arguendo*, that Plaintiff has established his prima facie case, this same evidence regarding employees who were laid off or transferred to hourly positions provides ample evidence that personnel actions that impacted Plaintiff were undertaken for legitimate, nondiscriminatory business reasons. *See, e.g.,* Reinman Dep. 27:2-28:17, 30:4-31:4, 31:23-33:13, ECF No. 33-1. Plaintiff fails to create an issue of fact as to pretext based on the evidence presented. Plaintiff has the ultimate burden of presenting evidence from which a reasonable jury could conclude Defendant intentionally discriminated against him based on his race. It is not necessary to decide "whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. Pepsico*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting and citing *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *DeJarnette*, 133 F.3d at 299 (noting the court "does not sit as a kind of super-personnel department weighing the prudence of employment decisions made by firms charged with employment discrimination . . . ." (internal quotation marks omitted)); *Henson v. Liggett Grp.,*

*Inc.*, 61 F.3d 270, 277 (4th Cir. 1995) ("We have recognized the importance of giving an employer the latitude and autonomy to make business decisions, including workplace reorganization, as long as the employer does not violate the ADEA."); *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 377 (4th Cir. 1995) ("Title VII is not a vehicle for substituting the judgment of a court for that of the employer."). It is the perception of the employer that is critical. *Hawkins*, 203 F.3d at 280. In sum, Plaintiff fails to present sufficient evidence to show Defendant discriminated against him because of his race.

Defendant has set forth detailed discussion and documentation regarding difficult business decisions it made during a downturned economy. The breakdown of the race and gender of those impacted by these decisions demonstrate Defendant's non-discriminatory business practices. Accordingly, summary judgment is recommended as to Plaintiff's Title VII discrimination claim.[8]

### 3. ADA

Plaintiff's fourth cause of action is one for "ADA Discrimination," in which he alleges Defendant violated the ADA by discriminating against him "on the basis of his disability[.]" Compl. ¶¶ 19-20, ECF No. 1. Under the ADA, an employer may not "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. §§ 12111(2), 12112(a). As the Fourth Circuit has explained, plaintiffs may bring failure-to-accommodate and wrongful-discharge

---

[8] To the extent Plaintiff is alleging discrimination based on the fact he was "demoted" and had to resume doing work of a more physical nature, that claim is discussed below in relation to his ADA claim. To the extent Plaintiff is claiming a Title VII "discrimination" claim on the basis of his being "demoted" and required to resume more physical labor, Plaintiff has not presented sufficient evidence to show any inference of discrimination based on the demotion.

claims pursuant to the ADA. *See Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001). Arguably, Plaintiff has raised both types of ADA claims.

a.   Failure to Accommodate Claim

In his brief, and at oral argument, Plaintiff seems to argue Defendant violated the ADA by failing to accommodate his "disability." *See* Pl.'s Mem. 8, ECF No. 32 (claiming Defendant "never issued Plaintiff light duty or modified Plaintiff's work requirements."). "In a failure to accommodate case, a plaintiff establishes a prima facie case by showing '(1) that he was an individual who had a disability within the meaning of the statute; (2) that the [employer] had notice of his disability; (3) that with reasonable accommodation he could perform the essential functions of the position . . . ; and (4) that the [employer] refused to make such accommodations.'" *Rhoads*, 257 F.3d at 387 n.11 (quoting *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 6 (2d Cir. 1999)).

The ADA defines "disability" "with respect to an individual[as]—(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1). Major life activities include "performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102(2). After the recent amendments to the ADA, which became effective January 1, 2009, the regulations now provide that "substantially limits" is to be "construed broadly in favor of expansive coverage, to the

maximum extent permitted by the terms of the ADA" and "is not meant to be a demanding standard." 29 C.F.R. § 1630.2(j)(1)(i). [9]

Defendant argues Plaintiff cannot establish he is "disabled" for purposes of the ADA because he has not shown he has an "impairment" that "substantially limits" a "major life activity" as defined in the ADA and interpreted in regulations of the EEOC. Def.'s Mem. 19-21, ECF No. 30-1; Def.'s Reply 7-8, ECF No. 36.

Plaintiff argues that his condition was "obviously disabling" because the Social Security Administration ("SSA") found him disabled as of October 28, 2009. Pl.'s Mem. 8, ECF No. 32; *see* Ltr. from SSA, ECF No. 33-9. Otherwise, in opposing Defendant's Motion, Plaintiff does not explain how he satisfies the portion of his prima facie failure-to-accommodate case that requires he establish he is a "person with a disability" under the ADA's definition, nor does he explain how he has satisfied the second prong of his prima facie case—that Defendant had notice of Plaintiff's "disability."

In response to a question from the court at the hearing on Defendant's Motion, Plaintiff's counsel explained that Plaintiff's disability had been primarily back pain, stating Plaintiff had been noting complaints of back pain, and then referring to Plaintiff's October 29, 2009 doctor's excuse. *See* ECF No. 33-5. In response to the court's follow-up questions, Plaintiff's counsel conceded Plaintiff had never requested light duty or any type of accommodation because of the "understood" company policy that no light duty would be given to an employee unless that employee had a workers' compensation claim involved. Instead, Plaintiff argues that, contrary to his understanding when he accepted the hourly crew-leader position, Defendant did not limit the

---

[9] The amendments took effect January 1, 2009, but they are not retroactive. *See Bateman v. Am. Airlines*, 614 F. Supp. 2d 660, 670 n.1 (E.D. Va. 2009). Although Plaintiff began working with Defendant before 2009, his disability claim focuses principally on events in 2009. Parsing which version of the ADA should be considered is not necessary to the court's recommendation herein.

amount of manual labor Plaintiff was required to do as crew leader. This manual labor, he argues, impacted him by causing more back pain and making it more difficult to perform his job. Plaintiff also argued Defendant did not discuss light duty or any accommodation with him when he obtained an FMLA form from the HR department in December 2009.

None of these arguments provides sufficient evidence or argument showing Plaintiff has established a prima facie case of an ADA failure-to-accommodate claim. Regarding whether Plaintiff had a disability within the meaning of the statute, the court notes Defendant's argument is principally based on case law interpreting the pre-2009 ADA and regulations concerning it. Because much of Plaintiff's argument regarding his ADA claim focuses on activities in 2009, the undersigned will not focus on that portion of Defendant's argument. Giving Plaintiff the benefit of the doubt, the court will assume, *arguendo*, that Plaintiff has established he had an impairment that "substantially limited" a "major life activity," thereby establishing the first prong of his prima facie case. *See* 29 C.F.R. § 1630.2(j)(1)(i) (noting "substantially limits" is not a difficult standard to satisfy).

Plaintiff must still establish the remaining prongs of his prima facie case. The only evidence in the record regarding the second prong—Plaintiff's having put Defendant on notice of a disability that required an accommodation—is the October 29, 2009 doctor's note and report indicating Plaintiff was in need of "light duty" because of "low back pain." ECF No. 33-5. *See* Pl.'s Br. 4, ECF No. 32 ("[I]t cannot be denied" that Plaintiff placed Defendant on notice of his injury as of October 29, 2009, and provided notice that Plaintiff was "in need of light duty work" at that time).

Plaintiff has made various arguments that he was being moved to positions that required more physical labor than he was able to perform. However, Plaintiff has not shown he had placed

Defendant on notice of his having a disability that required accommodation prior to the October 29, 2009 note. In his brief, Plaintiff cites to a December 21, 2009 letter from Defendant's workers' compensation insurance carrier as evidence that Defendant, through HR Director Reinman, "recall[ed]" Plaintiff missed work in 2003 for back surgery and that Defendant paid Plaintiff his full salary when out in 2003 because of such surgery. Pl.'s Mem. 4, ECF No. 32; Dec. 21, 2009 Ltr., ECF No. 33-3. Plaintiff then submits that Defendant, through Reinman, had knowledge "in 2008, at the time of Plaintiff's change in work assignment," that Plaintiff had complained of "pain in his right calf." *Id.*

The evidence cited by Plaintiff does not suffice to show Defendant was on notice of Plaintiff's having a "disability" prior to the 2009 doctor's report. Although Reinman did testify that she recalled Plaintiff was out with back surgery in 2003, nothing in her cited testimony demonstrates Defendant was "on notice" of a disability for which Plaintiff sought some accommodation. *See* Reinman Dep. 35:15-23. Her cited testimony does not bear out Plaintiff's argument that Reinman learned of Plaintiff's having right-calf pain as of 2008, when he was being reassigned duties. *See id.* at 33:19-21. Rather, Reinman recalled Plaintiff's physical condition in 2008 was "perfectly fine," and that she was unaware of any physical issues until Plaintiff called in to report the calf pain (which was in October 2009). *Id.* Plaintiff has provided no competent evidence that Plaintiff ever put Defendant on notice of, or sought an accommodation for, a disability pursuant to the ADA prior to October 29, 2009.

Further, even assuming Plaintiff put Defendant "on notice" of a disability as of October 29, 2009, he has proffered no evidence to establish his prima facie case even after that date. In particular, Plaintiff has not demonstrated that "he was a qualified individual—that is, he could have performed the essential functions of his position." *Wilson v. Dollar Gen. Corp.*, 717 F.3d

337, 345 (4th Cir. 2013). *See also* 42 U.S.C. § 12111(8) (ADA's defining a "qualified individual" as one who "with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."). Plaintiff has the burden of "identifying an accommodation that would allow a qualified individual to perform the job" and showing "that such an accommodation is reasonable." *Shin v. Univ. of Md. Med. Sys. Corp.*, 369 F. App'x 472, 481 (4th Cir. 2010).

Plaintiff has not demonstrated that, with an accommodation, he could perform the essential functions of his job as of October 29, 2009. *Rhoads*, 257 F.3d at 387 n.11. In fact, Plaintiff has not identified any accommodation that would allow him to perform his job. To the contrary, Plaintiff testified that, after October 29, 2009—the last day he worked—based on what he has been told by his doctor, he could not perform the job he last held with Defendant. In addition, Plaintiff testified there was not any job at Defendant's plant he could now perform. Pl.'s Dep. 24:16-25:16, ECF No. 30-3. In other words, Plaintiff concedes he cannot set forth his prima facie case and he concedes he is not a "qualified individual" under the ADA because, at least as of October 29, 2009, he could no longer "perform the essential functions of the employment position" he held, and because there would be no reasonable accommodation Defendant could provide to permit him to return to work.[10] *See Wilson*, 717 F.3d at 345-46 (affirming grant of summary judgment on ADA failure-to-accommodate claim in part because

---

[10] Further, Plaintiff did not return to work after October 29, 2009. Plaintiff was out on prescheduled furlough leave for the month of November 2009. Pl.'s Dep. 82:10-24, ECF No. 30-3. In early December 2009, Plaintiff informed Defendant of a claimed work-related injury, requested a "personal medical leave of absence," and indicated his intent to "provide a detailed letter of resignation." Dec. 4, 2009 Ltr., ECF No. 30-4. Defendant provided Plaintiff with paperwork for FMLA purposes as he remained employed at that time. *See* Dec. 8, 2009 Ltr. to Pl., ECF No. 33-10 (including FMLA paperwork and noting doctor's excusing Plaintiff from work through Dec. 7, 2009).

plaintiff "had not identified a possible reasonable accommodation [] that would have enabled him to perform the essential functions of his position").

Accordingly, summary judgment is appropriate as to Plaintiff's ADA failure-to-accommodate claim.

> b. ADA: Wrongful Discharge, Based on Hostile-Work-Environment and Constructive-Discharge Claims

Plaintiff characterizes his leaving Defendant's employ as having been "forced to leave" because of "[h]arassment for attendance, harassment for job opportunity[,]" explaining he was not allowed to "perform [his] job as [he] signed or agreed to as a crew chief leader" when he changed jobs in November 2008. Pl.'s Dep. 184:5-14, ECF No. 30-3. In his brief opposing summary judgment, Plaintiff apparently ties the November 2008 job change to increasing physical demands on him that he was unable to meet, thereby causing him to miss more work. *See* Pl.'s Mem. 4-5, ECF No. 32.

Based on Plaintiff's argument, Defendant focuses a portion of its Motion and Reply on analyzing Plaintiff's ADA claim as one for wrongful discharge. *See* Def.'s Reply 5-11.  In an ADA wrongful-discharge case, a plaintiff makes out a prima facie case by demonstrating that "(1) he is within the ADA's protected class; (2) he was discharged; (3) at the time of his discharge, he was performing the job at a level that met his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am., Inc.*, 252 F.3d 696, 702 (4th Cir. 2001). To the extent Plaintiff's Complaint includes an ADA claim (or any other employment-related claim) based on establishing a hostile work environment and demonstrating he was constructively discharged, the undersigned agrees with Defendant that summary judgment is appropriate as to such claims.

26

i.    Hostile Work Environment Claim

Plaintiff's Complaint does not include a separate hostile-work-environment/harassment cause of action. In the factual allegations of his Complaint, though, Plaintiff avers: "As a result of the hostile working environment and unbearable working conditions in light of his disabling condition, and as a result of Plaintiff's failure to excuse Plaintiff's absences or accommodate Plaintiff, Plaintiff was forced to resign his employment and therefore was constructively discharged." Compl. ¶ 9(g). As did Defendant, the court also considers Plaintiff's ADA claim as including a hostile-work-environment and constructive-discharge component.

To establish a hostile work environment claim pursuant to the ADA, Plaintiff must present evidence to prove the following elements:  (1) he is a qualified person with a disability; (2) he was subjected to unwelcome conduct in a work-related setting; (3) the conduct complained of was based on his disability; (4) the conduct was sufficiently severe or pervasive to alter his condition of employment and to create an abusive work environment;[11] and (5) the conduct is imputable on some factual basis to his employer. *Fox v. Gen. Motors Corp.*, 247 F.3d 169, 176-77 (4th Cir. 2001).

As discussed above, it is questionable whether, at least until October 29, 2009, Plaintiff can establish he has a "disability" for purposes of the ADA. Even if he had a "disability" prior to October 29, 2009, Plaintiff cannot establish he was a "qualified individual" for purposes of the ADA as he has not provided evidence that he could perform his job or other jobs with or without accommodation, nor has he identified other available jobs he could perform. Because Plaintiff has not satisfied his burden of proof on this point, he cannot establish the first prong of an ADA

---

[11] To satisfy the fourth prong, a plaintiff must show not only that he believed subjectively that his workplace environment was hostile, he must also show that a reasonable person could objectively perceive it to be hostile. *Fox*, 247 F.3d at 178.

hostile-work-environment claim. *See Wilson*, 717 F.3d at345-46 (finding plaintiff had not established he was "qualified individual" for ADA claim because he did not identify a possible reasonable accommodation that would have permitted him to perform the essential functions of his position). Further, for the time period subsequent to October 2009, Plaintiff cannot establish he is a "qualified person with a disability" for purposes of the ADA because he has admitted that he could not perform the job he held in October 2009, nor was there any job working with Defendant he could perform at that time. Pl.'s Dep. 24:16-25:16, ECF No. 30-3. Because Plaintiff cannot establish the first prong of his prima facie case, *see Fox*, 247 F.3d 176,[12] Defendant's Motion for Summary Judgment should be *granted* as to Plaintiff's ADA claim based on a hostile work environment.

Plaintiff has not set forth evidence sufficient to establish a claim for hostile work environment based on the ADA. To the extent Plaintiff's ADA cause of action is premised on a hostile-work-environment claim, it should be dismissed.

## ii.    Constructive Discharge

To demonstrate a wrongful-termination ADA claim, Plaintiff must show he was terminated. *See Haulbrook*, 252 F.3d at 702. Because Plaintiff argues his resignation was "forced," the court considers whether Plaintiff can demonstrate he was constructively discharged. To state a cause of action for constructive discharge a plaintiff must allege "(1) deliberateness of the employer's actions and (2) intolerability of the working conditions."

---

[12] Further, as Defendant argues, Plaintiff has not presented evidence sufficient to demonstrate the claimed unwelcome conduct was so "severe and pervasive" it, both objectively and subjectively, "altered the conditions" of Plaintiff's work environment and "created an abusive working environment." *Fox*, 247 F.3d at 178. Additionally, as discussed above, Plaintiff had not placed Defendant on notice of a disability prior to October 29, 2009. Accordingly, Defendant was unaware Plaintiff fell into a protected class, and Plaintiff cannot demonstrate any claimed unwelcome conduct was "based on his disability." *Cf. Fox*, 247 F.3d at 177.

*Whitten v. Fred's Inc.*, 601 F.3d 231, 248 (4th Cir. 2010) (internal quotation marks and citations omitted) (abrogated in part on other grounds, *Vance v. Ball St. Univ.*, 133 S. Ct. 2434, 2443 (2013)). To plead the deliberateness element properly, a plaintiff must allege that "the actions complained of were intended by the employer as an effort to force [him] to quit." *Id.* (quoting *Martin v. Cavalier Hotel Corp.,* 48 F.3d 1343, 1353-54 (4th Cir. 1995)). Plaintiff must demonstrate the "(1) deliberateness of the employer's actions and (2) intolerability of the working conditions." *Whitten*, 601 F.3d at 248 (internal quotation marks and citations omitted). In establishing deliberate action on the employer's part, a plaintiff must prove "that the actions complained of were intended by the employer as an effort to force the employee to quit." *Martin*, 48 F.3d at 1353-54.[13]

---

[13] The *Martin* court acknowledged that the majority of the circuits focus on the effect an employer's actions have on an employee and whether a reasonable person in the employee's position would have felt compelled to resign. 48 F.3d at 1354 (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993); *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987); *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987); *Calhoun v. Acme Cleveland Corp.*, 798 F.2d 559, 561 (1st Cir. 1986); *Derr v. Gulf Oil Corp.*, 796 F.2d 340, 344 (10th Cir. 1986); *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887-88 (3d Cir. 1984); *Bourque v. Powell Elec. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980)).

The Fourth Circuit Court of Appeals takes the minority view, which requires a plaintiff to also prove that "the actions complained of were intended by the employer as an effort to force the employee to quit." *Martin*, 48 F.3d at 1354. The Fourth Circuit at least nodded to this difference in *Whitten*, noting that the language of the [*Pa. St. Police v.*] *Suders,* [542 U.S. 129 (2004)] opinion suggested the Fourth Circuit's "requirement that the plaintiff prove the employer intended to force the plaintiff to quit is arguably in some tension with the Supreme Court's decision in *Suders*[.]" 601 F.3d at 248 n.8 (noting *Suders* defined constructive discharge as including working conditions "'so intolerable that a reasonable person would have felt compelled to resign.'"). Nonetheless, the Fourth Circuit noted it had continued to "apply the deliberateness requirement to constructive-discharge claims since *Suders* was decided[,]" and found that circuit precedent prevented it from considering plaintiff's argument that deliberateness was no longer an element of a constructive discharge claim. 601 F.3d at 248 n.8. *See also Carter v. Centura Col.*, Civil Action No. 2:10-907-CWH, 2012 WL 638800, *11 (D.S.C. Feb. 27, 2012) (noting the Fourth Circuit's discussion of, and continued requirement of, deliberateness in constructive-discharge matter).

It is undisputed that Plaintiff quit his position.  Defendant argues Plaintiff has not presented evidence sufficient to demonstrate it "intended" that Plaintiff quit, nor has he shown "intolerable" working conditions.  The undersigned agrees.

Considering the evidence in the light most favorable to Plaintiff, he argues he was constructively discharged because of Defendant's increasing physical demands on him in his hourly-paid position and by Defendant's reprimanding him for absences although some absences were the result of his pain because of increased physical demands of the job.  Plaintiff argues that "Defendant continued to reprimand [him] with attendance violations despite knowledge of [his] serious health condition." Pl.'s Mem. 8, ECF No. 32.  He argues that "[b]ecause of this hostile attitude toward Plaintiff's need for doctor's care, Plaintiff felt he had no choice but to resign from his employment before being terminated for attendance violations which Plaintiff believed to be unwarranted." *Id.* at 8-9.

Plaintiff has not demonstrated "hostility" by showing he was reprimanded for absences. Plaintiff now generally claims that some of the attendance reprimands (points) were unwarranted, arguing that Defendant was "penalizing" him for attendance issues, "[d]espite Defendant's knowledge of Plaintiff's injury[.]" Pl.'s Mem. 4, ECF No. 32.

For example, Plaintiff notes that employees are given a birthday gift of a day off, and the day does not have to be on the actual birthdate. *Id.* (citing Reinman Dep. 14:4-9, ECF No. 33-1). Plaintiff argues Defendant incorrectly counted his August 7, 2009 absence against him, in "direct contradiction to Defendant's policy." Pl.'s Mem. 5 (citing Pl.'s Attendance Record 2009, ECF No. 33-6, which notes an "ABSL" absence on August 7, 2009). As explained by Reinman, an absence coded "ABSL," which stands for "Absent More than Two Hours," results in the employee accumulating an attendance "point" under Defendant's system. Reinman Dep. 43:12-

44:3, ECF No. 33-1. Reinman further explained Plaintiff would have been permitted to take August 7, 2009 as his birthday holiday, which would not result in accumulating a point, if he had prearranged with his supervisor to do so. *Id.* at 44:20-45:14. However, if the employee does not prearrange to use a birthday holiday and provide a "Birthday Request" form, the absence will not be counted as the "birthday gift" holiday. *See id.* Reinman testified she had no knowledge whether Plaintiff's supervisor might have neglected to turn in such a form. *Id.* at 45:8-11. Plaintiff points to no evidence that he had put Defendant on notice that he sought to count August 7, 2009 as his birthday holiday, other than to note his 2008 attendance record counted an August 7 absence as paid leave. *See* ECF No. 33-7. Further, the record includes two forms that Plaintiff signed acknowledging he had 8 ½ attendance points as of September 17, 2009. ECF No. 30-4 at 28, 29. On the form Plaintiff signed September 9, 2009—just a month after the August 7, 2009 absence—his absence of August 7 is included as one for which he accumulated a point. *Id.* Plaintiff had ample opportunity to question his being assessed a point for his August 7, 2009's absence. He did not do so. Plaintiff's post-hoc argument that this somehow demonstrates hostility or discrimination is unconvincing.

Similarly unconvincing are other claims Plaintiff makes about his absences on September 17 and 18, 2009. Plaintiff points to a doctor's excuse dated June 8, 2010—nine months after the dates at issue—as evidence that Defendant improperly assessed points against him for those dates. *See* Pl.'s Mem. 5, ECF No. 32; June 8, 2010 Ltr. from Leonard Brown D.M.D., ECF No. 33-8.

However, Defendant has set forth evidence, uncontradicted by Plaintiff, that he was aware of having 8 ½ points as of September 17, 2009. Pl.'s Dep. 80:8-12, ECF No. 30-3; Employee Warning Notice, ECF No. 30-4 at 1-2 (signed by Plaintiff and indicating "8 ½ pts. as

of 9/17/09"). He signed this form on October 23, 2009. *Id.* In late October 2009, after running attendance reports, Reinman issued attendance notices. *Id.* at 47:12-13. Because Plaintiff had not returned to work, Reinman sent a letter to Plaintiff dated December 11, 2009, attaching his second and third written notices for absences through October 16, 2009, and October 31, 2009, respectively. ECF No. 33-11. As of October 16, 2009, Plaintiff had accumulated nine-and-one-half points, and as of October 31, 2009, Plaintiff had accumulated 12 points. *Id.*

Importantly, Plaintiff sent his first letter of resignation on December 4, 2009, prior to Reinman's December 11, 2009 letter with his notice of his 12 attendance points.

Although Plaintiff focuses on his October 2009 injury, he did not tell Defendant it was a work-related injury when he first informed them of the injury. Pl.'s Dep. 107:19-109:2, ECF No. 30-3; exs. 13 and 17 to Pl.'s Dep., ECF No. 30-4. Rather, Plaintiff called in on October 29, 2009 and reported that his calf hurt and he was going to the doctor. Pl.'s Dep. 108:12-16, ECF No. 30-3. On October 30, 2009, Plaintiff again called in and left a message that he was under a doctor's attention, and had his son drop off a doctor's excuse. *Id.* at 108:17-24. The excuse from Dr. Gerard Jebaily dated October 29, 2009, read: "Low back pain, Light duty off 10/29, 10/30." ECF No. 33-5. Plaintiff did not return to work during the month of November because he was scheduled to be off on voluntary furlough. Pl.'s Dep. 82:10-22, ECF No. 30-3.

As Reinman explained, she wrote Plaintiff on December 11, 2009 to provide him with the attendance warnings relating to the time period through mid-October 2009 because he had not been at work in November. Reinman, 46:19-50:8, 63:7-18; Pl.'s ex. 4 to Reinman Dep.; ECF No. 30-5 at 43.

Plaintiff has not set forth evidence sufficient to establish that Defendant "intended" for him to resign. Further, he cannot establish the other requirement for establishing constructive discharge: intolerable working conditions.

Intolerability of conditions is assessed by the objective standard of whether a "reasonable person" in the same position would also have felt compelled to resign. *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985), 770 F.2d at 1255. As the Fourth Circuit has noted:

> [T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge. Every job has its frustrations, challenges, and disappointments; these inhere in the nature of work. An employee is protected from a calculated effort to pressure him into resignation through the imposition of unreasonably harsh conditions, in excess of those faced by his co-workers. He is not, however, guaranteed a working environment free of stress.

*Id.* Further, "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable to compel a reasonable person to resign." *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 262 (4th Cir. 2006) (internal quotation marks and citations omitted).

Plaintiff has not presented evidence sufficient to establish a constructive discharge claim. As discussed above, Plaintiff's attempt to tie Defendant's notifications regarding his work absences to his claimed disability falls short. Further, although he may have feared termination after receiving information about his attendance from Defendant's Human Resources Department, such subjective fear does not constitute an intolerable working condition. *See Mozingo v. S. Fin. Grp., Inc.*, 520 F. Supp. 2d 733, 742 (D.S.C. 2007) (finding no constructive discharge claim under Sarbanes Oxley Act when plaintiff resigned because he was concerned he would be fired, noting that, although plaintiff's "fear that he was going to be fired may have been reasonable, the fear of being fired does not amount to a constructive discharge.").

Plaintiff's disagreements with his reassignments and his concern over attendance updates do not provide evidence sufficient to survive summary judgment. To the extent Plaintiff claims he was constructively discharged, such claim should be dismissed as a matter of law.

### 4.  Plaintiff's SCHAL Claims

Plaintiff's Complaint also includes claims based on South Carolina's Human Affairs Law ("SCHAL"), S.C. Code Ann. § 1-13-10, *et seq*. Compl. ¶¶ 14-15. Defendant argues these claims fail for the same reasons the Title VII and ADA/ADAA claims fail. Def.'s Mem. 1, n.1, ECF No. 30-1.  The undersigned agrees. *See Gilchrist v. Parth's Inc.,* No. C/A 4:10-3034-JMC, 2011 WL 6842992 (D.S.C. Oct. 3, 2011); *Orr v. Clyburn*, 290 S.E.2d 804, 806 (S.C. 1982) (noting SCHAL essentially follows the substantive structure of Title VII and that cases interpreting Title VII are given persuasive if not binding authority).

It is recommended that Defendant's Motion for Summary Judgment be granted as to Plaintiff's SCHAL claims based on the reasons discussed above in connection with his Title VII and ADA/ADAA claims.

### III.    Conclusion

For the foregoing reasons, the undersigned recommends that Defendant's Motion for Summary Judgment, ECF No. 30, be granted and Plaintiff's case be dismissed with prejudice in its entirety.

IT IS SO RECOMMENDED.

July 19, 2013                                          Kaymani D. West
Florence, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**